**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **MAZEN SHAHIN, and** | : |
| **NINA SHAHIN, his wife** | : |
| **Plaintiffs** | : |
| **v.** | :    **3:CV-02-0925** |
| | :    **(CHIEF JUDGE VANASKIE)** |
| **COLLEGE MISERICORDIA, a** | : |
| **Pennsylvania Non-Profit Corporation** | : |
| **Defendant** | : |

## MEMORANDUM

This case concerns alleged religious and national origin discrimination in employment by Defendant College Misericordia ("Misericordia") in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII").  Plaintiff Mazen Shahin claims a hostile work environment, disparate treatment, and constructive discharge based on religious and ethnic discrimination at the college, as well as retaliation for asserting his statutorily protected rights. He additionally asserts common law claims of breach of contract, intentional infliction of emotional distress, and negligent infliction of emotional distress.  His wife, Nina Shahin, alleges loss of consortium.  Misericordia has moved for summary judgment on all claims.

Because Shahin failed to present sufficient evidence to support an inference of national origin or religious discrimination at Misericordia, he has not presented an actionable Title VII discrimination case.  Nor has he presented an actionable Title VII retaliation claim, as he failed to rebut Misericordia's nondiscriminatory, legitimate reason for reassigning him to a different

department after Shahin claimed discrimination at Misericordia.  Consequently, Misericordia is

entitled to summary judgment on all of Shahin's Title VII-based claims.  The Court declines to

exercise supplemental jurisdiction over Shahin's remaining state-law claims or his wife's loss of

consortium claim.  Thus, they will be dismissed, without prejudice, and this case is completed in

this Court.

## I.  BACKGROUND

### A.    Factual Background

Shahin is a Muslim from Egypt.  (Def.'s Statement of Material Facts ("Def.'s S.M.F.")

(Dkt. Entry 25) ¶ 4; Pls.' Statement of Material Facts ("Pls.' S.M.F.") (Dkt. Entry 35) ¶ 4.)

Misericordia, a Catholic college, hired him as a professor in its Mathematics and Computer

Science Department starting in September 1989.  (Def.'s S.M.F. (Dkt. Entry 25) ¶¶ 1, 3, 27,

237.)[1]  Misericordia assisted Shahin in obtaining a visa to work in the United States.  (Def.'s

S.M.F. (Dkt. Entry 25) ¶¶ 24-25.)

At the time of Shahin's hiring, Sister Agnes Brennan was the acting Chair of the

Mathematics and Computer Science Department, and Sister Mary Glennon was the acting

Academic Dean.  (Id. ¶¶ 17, 20, 23.)  Both participated in Shahin's hiring, including personal

---

[1]  Citation to Defendant's Statement of Material Facts signifies that Plaintiffs admitted the asserted fact without qualifications.  Where Plaintiffs' reply to a particular assertion of fact qualifies that assertion in a material way, citation is made to both Defendant's and Plaintiffs' Statements of Material Facts.

interviews.  (Id.; Tr. of Sister Mary Glennon's April 23, 2004 Dep. (Dkt. Entry 30) at 74-79.)

Shahin's first alleged instance of discrimination at Misericordia occurred when he applied for tenure and reappointment during the 1992-1993 academic year.  (Id. ¶¶ 5, 31-38; Pls.' S.M.F. (Dkt. Entry 35) ¶¶ 31-38; Tr. of Shahin Dep. of Sept. 5, 2003 (Dkt. Entry 30) at 32-33.)  Shahin's Department Chair, Sister Brennan, did not support Shahin's application for tenure or reappointment.  (Def.'s S.M.F. (Dkt. Entry 25) ¶ 32.)  Shahin claims that Sister Brennan's decision was the product of discrimination.  (Pls.' S.M.F. (Dkt. Entry 35) ¶ 34.)  He was not granted tenure that year, but was reappointed as an Associate Professor.  (Def.'s S.M.F. (Dkt. Entry 25) ¶ 33; Tr. of Shahin Dep. of Sept. 5, 2003 (Dkt. Entry 30) at 32-33, 45-46.)

Afterwards, Sister Brennan informed Shahin that she was going to ask another member of the department, Patrick Touhey, to evaluate him in the future.  (Tr. of Shahin Dep. of Sept. 5, 2003 (Dkt. Entry 30) at 48-49.)  Shahin objected to this procedure and filed a grievance against Sister Brennan with the Academic Dean, Sister Glennon, in accordance with Misericordia's Faculty Handbook.  (Def.'s S.M.F. (Dkt. Entry 25) ¶ 35; (Dep. Ex. 21 (Dkt. Entry 31).)  Shahin complained of a "hostile attitude towards [him]" by Sister Brennan, creating an "unbearable atmosphere."  (Dep. Ex. 21 (Dkt. Entry 31) at 1-2.)  He expressed his concern that Sister Brennan was incapable of providing an unbiased evaluation of him in the future and requested two outside mathematicians to evaluate him in the future.  (Id. at 2.)  Shahin did not specifically

3

cite national origin or religious discrimination in his grievance.  (Def.'s S.M.F. (Dkt. Entry 25) ¶

38.)

Dean Glennon interpreted Shahin's grievance to request that "steps be taken to assure

that when next you apply for reappointment, promotion, and tenure, you receive a fair review."

(Dep. Ex. 22 (Dkt. Entry 31) at 1.)  She supported Shahin's request for an external evaluator.

(Id.)  Misericordia subsequently allowed one external evaluator to participate in Shahin's future

tenure applications, which was an exception to the procedures for tenure applications.  (Def.'s

S.M.F. (Dkt. Entry 25) ¶ 50.)  Touhey did not evaluate Shahin during his next reappointment

application.

On November 20, 1993, Sister Brennan completed a scheduled evaluation of Shahin.

(Dep. Ex. 24 (Dkt. Entry 31).)  The evaluation included both positive observations (i.e.,"Mazen

[Shahin] is to be commended for his work on the Summer Outreach Program for Minority

students"), and negative observations (i.e., "Mazen [Shahin's] Discrete Math course is the only

course that consistently brings students with complaints to my office every semester").  (Id. at

3, 6.)  In conclusion, Sister Brennan believed "very strongly that there is not a good match

between [Shahin's] gifts and College Misericordia's needs."  (Id. at 7.)  Sister Brennan's primary

concern was Shahin's ability to communicate in English.  (Id. at 1-2, 7.)

In the 1993-1994 academic year, Sister Brennan again opposed Shahin's reappointment

as an Associate Professor.  (Def.'s S.M.F. (Dkt. Entry 25) ¶ 43.)  Shahin was nonetheless

reappointed as an Associate Professor.  (Id. ¶ 44.)  In Shahin's reappointment letter, Dean

Glennon noted her concern that Shahin's student evaluations had been "consistently weak."

(Id. ¶ 45.)

Sister Brennan resigned from her teaching position at the end of the 1993-1994

academic year.  (Id. ¶ 52.)  Before she resigned, the three members of the Mathematics and

Computer Science Department elected Touhey as Department Chair.[2]  (Id. ¶¶ 53-54; Pls.'

S.M.F. (Dkt. Entry 35) ¶¶ 53-54).)  Touhey is an atheist.  (Def.'s S.M.F. (Dkt. Entry 25) ¶ 55.)

In the 1994-1995 academic year, Shahin again applied for tenure.  (Id. ¶ 59.)  As

Shahin's Department Chair, Touhey did not support Shahin's tenure application.  (Id. ¶ 60.)

Touhey identified the reason for not supporting the tenure application as related to the manner

in which Shahin presented a mathematics problem to his class, though Shahin claims that the

reason was not correct.  (Id. ¶ 61; Pls.' S.M.F. (Dkt. Entry 35) ¶ 61.)  An external evaluator

supported Shahin's tenure application.  (Def.'s S.M.F. (Dkt. Entry 25) ¶ 58.)  Shahin was

granted tenure.  (Id. ¶ 62.)

In the 1995-1996 academic year, Shahin sought a promotion to full professor.  (Id. ¶ 63.)

Touhey did not make any recommendation in regards to Shahin's promotion.  (Id. ¶ 64; Pls.'

S.M.F. (Dkt. Entry 35) ¶ 64).)  Shahin's application for full professorship was granted.  (Def.'s

---

[2] In accordance with Misericordia's policies, Sister Brennan participated in the department chair election before departing.  She joined Touhey in electing him Chair.

S.M.F. (Dkt. Entry 25) ¶ 65.)

In May of 1996, Shahin asked for funds to purchase a multi-media computer and laser printer.[3]  (Id. ¶ 67.)  Touhey offered Shahin a used laser jet printer and a letter-quality desk jet printer, but Shahin refused them.  (Id. ¶¶ 79-80; Pls.' S.M.F. (Dkt. Entry 35) ¶¶ 79-80).  Shahin says he urgently needed a new computer because he was the only faculty member of the Mathematics and Computer Science Division who taught a full time upper level Computer Science course, and he had developed computer-based curriculum material.  (Id. ¶¶ 72-73; Pls.' S.M.F. (Dkt. Entry 35) ¶ 71).)  At the time, Misericordia was implementing a computer replacement program that would not replace computers in the Mathematics and Computer Science Department until the 1997-1998 academic year.  (Def.'s S.M.F. (Dkt. Entry 25) ¶¶ 69-71; Pls.' S.M.F. (Dkt. Entry 35) ¶ 71).)  Shahin's request for a computer upgrade was not granted, though Dean Glennon suggested he use grant money to purchase the equipment or sign out a notebook computer from the college.  (Def.'s S.M.F. (Dkt. Entry 25) ¶¶ 74-75.)  Shahin's computer was replaced at the same time as the other Department computers.  (Id. ¶ 76.)

On December 19, 1996, Shahin requested sabbatical leave for the 1997-1998 academic

---

[3] Shahin claims he was granted his request for a laser printer during an August 31, 1994 Department meeting, but Touhey kept the printer himself when it arrived.  (Pls.' S.M.F. (Dkt. Entry 35) ¶ 67.)  Shahin also asserts that he requested a multi-media computer before May of 1996.  (Id.)

year for a visiting professorship in the Middle East.  (Def.'s S.M.F. (Dkt. Entry 25) ¶ 85; Pls.'

S.M.F. (Dkt. Entry 35) ¶ 86.)  His request was not granted until May 30, 1997.  (Def.'s S.M.F.

(Dkt. Entry 25) ¶ 86.)  According to Shahin, the decision was untimely in that the Faculty

Handbook provided that an applicant be notified "no later than six (6) months prior to the start of

the leave whether her/his application has been approved."  (Pls.' S.M.F. (Dkt. Entry 35) ¶ 86.)

Two other faculty members applied for sabbatical leave around the same time as

Shahin.  (Def.'s S.M.F. (Dkt. Entry 25) ¶ 87.)  They received formal notification granting them

sabbatical leave on May 30, 1997 and June 4, 1997.  (Id. ¶ 88-89.)  Shahin, however, contends

that one of the professors was verbally notified of his approval "a long time" beforehand,[4] while

the other professor's sabbatical notification was timely because he did not leave until the Spring

of 1998.  (Pls.' S.M.F. (Dkt. Entry 35) ¶¶ 88-89.)

Shahin complained to the College President that notification of his sabbatical came too

late for him to take sabbatical leave for the 1997-1998 academic year and "therefore is not

acceptable."  (Def.'s S.M.F. (Dkt. Entry 25) ¶ 93.)  Dean Glennon informed Shahin on

December 5, 1997 that he could take sabbatical leave for the 1998-1999 academic year without

reapplying.  (Id. ¶¶ 95-96.)  Shahin did not take this sabbatical leave.

After becoming Chair of the Department of Mathematics and Computer Science, Touhey

became responsible for assigning professors to advise students majoring in the department.

---

[4] Other than his own testimony, Shahin offers no evidence to support this contention.

(Def.'s S.M.F. (Dkt. Entry 25) ¶ 108; Pls.' S.M.F. (Dkt. Entry 35) ¶ 108.)  Touhey decided not to assign Shahin as the advisor for any students.  (Def.'s S.M.F. (Dkt. Entry 25) ¶ 99.)  He said he made this decision after having to assist an advisee of Shahin's who was not going to graduate on time because he failed to properly schedule core courses necessary for graduation.  (Id. ¶ 100.)  Shahin denies Touhey's assertion.  (Pls.' S.M.F. (Dkt. Entry 35) ¶ 100.)  Touhey claimed that Shahin was not harmed by his decision because he had already been granted tenure as a full professor.  (Def.'s S.M.F. (Dkt. Entry 25) ¶ 107.)  Shahin says he was harmed by Touhey's decision because his role in advising students is a factor in five-year evaluations required of tenured professors.  (Pls.' S.M.F. (Dkt. Entry 35) ¶ 107.)

Touhey also altered the manner of scheduling courses in the department.  Previously, faculty in the Mathematics and Computer Science Department selected course assignments at a faculty meeting.  (Def.'s S.M.F. (Dkt. Entry 25) ¶ 115.)  During the 1994-1995 academic year, Touhey decided to use a "sports draft" method of selecting courses in an attempt to stop professors from selecting the same courses to teach each year, but the professors continued to select the same courses.  (Id. ¶ 117.)  In the 1995-1996 academic year, Touhey instead assigned courses to professors without prior consultation, though Shahin alleges, without evidentiary support, that Touhey may have had prior consultations with other faculty members in the department.  (Id. ¶ 118; Pls.' S.M.F. (Dkt. Entry 35) ¶¶ 118-19.)  For the Spring, 1996 semester, Shahin taught two upper lever courses and the tentative schedule for the Fall of

8

1997 called for him to teach one upper level course.  (Def.'s S.M.F. (Dkt. Entry 25) ¶¶ 125-26.)

Shahin claims that Touhey sometimes did not assign him an appropriate number of upper level

mathematics courses in the following years.  (Pls.' S.M.F. (Dkt. Entry 35) ¶ 124.)  He

complained to the College President about course assignments in February of 1997, and

formally filed a grievance against Touhey on this subject in November of 1997.  (Id. ¶¶ 123-24.)

While Touhey was his department chair, Shahin made multiple requests to attend

academic conferences.  In 1996, Touhey approved funds for Shahin to attend a conference at

Boston University.  (Id. ¶ 139.)  In December 1996, Shahin requested $ 1,167 to attend a

conference and meeting in San Diego, California.  (Def.'s S.M.F. (Dkt. Entry 25) ¶¶ 130-31;

Pls.' S.M.F. (Dkt. Entry 35) ¶¶ 130-31.)  Touhey approved $ 512.00 for Shahin to attend the

conference, but did not grant additional funds for Shahin to remain in San Diego for the

subsequent meeting.  (Def.'s S.M.F. (Dkt. Entry 25) ¶¶ 133-34.)  Touhey also denied requests

by Shahin for funds to attend a conference in San Antonio, Texas and overseas.  (Id. ¶ 142.)

According to Touhey, he denied these requests because he thought the faculty should focus on

attending conferences in the region where Misericordia is located.  (Tr. of Touhey's May 5,

2004 Dep. (Dkt. Entry 30) at 53.)  The record does not indicate that Touhey or Jerry Bradford,

the other professor in the Mathematics and Computer Science Department, attended any

conferences outside the East Coast or Mid-Atlantic region while Touhey was chair.  (Def.'s

S.M.F. (Dkt. Entry 25) ¶ 145; Pls.' S.M.F. (Dkt. Entry 35) ¶ 145.)

As department chair, Touhey was in charge of scheduling summer courses.[5]  (Id. ¶ 151.)
On May 16, 1996, Shahin wrote a memorandum to Touhey expressing his interest in teaching a
summer class and asking why a department meeting had not been scheduled to discuss
summer course scheduling.  (Id. ¶ 154.)[6]  Touhey responded that assignments for summer
courses for 1996 had already been made.  (Id. ¶ 157.)  Touhey stated that he expected faculty
members to inform him of their interest in teaching summer courses, while Shahin believed the
department chair should approach faculty members before scheduling summer courses.  (Id. ¶
152; Pls.' S.M.F. (Dkt. Entry 35) ¶ 152.)  It appears that Shahin had not previously expressed
any interest in teaching a summer course.

On January 20, 1997, Shahin filed a grievance with Dean Glennon against Touhey,
complaining about being denied funds for attending professional meetings, being denied the
laser printer he requested, departmental budgets not being discussed at department meetings,
and not being informed of summer and overload courses in departmental meetings.  (Dep. Ex.
45 (Dkt. Entry 31).)  Shahin did not specifically complain of religious or national origin
discrimination in his grievance, though he now believes the acts were based on discrimination.
(Id.; Pls.' S.M.F. (Dkt. Entry 35) ¶ 161.)  Dean Glennon found that Shahin failed to present a

---

[5] Shahin argues that a department chair must schedule department courses "in concert
with the total division scheduling."  (Pls.' S.M.F. (Dkt. Entry 35) ¶ 151.)

[6] There is no evidence that Shahin ever requested to teach a summer course before or
after May of 1996.

grievable issue.  (Def.'s S.M.F. (Dkt. Entry 25) ¶ 164.)  The faculty handbook defines grievable issues as those which injure the teacher due to "an error in the application of institutional policy, procedure or the administration thereof."  (Id. ¶ 163.)  Shahin contends that Dean Glennon lacked the authority to make that determination.  (Pls.' S.M.F. (Dkt. Entry 35) ¶ 164.)

For the Fall of 1997, Touhey scheduled Shahin to teach Friday afternoon classes in conflict with his Friday afternoon prayers.  (Shahin's Mem. dated June 17, 1997, Ex. 43 (Dkt. Entry 31) at 2.)  Touhey claims that he was not aware that Shahin needed Friday afternoons free for prayer.  (Tr. of Touhey's May 5, 2004 Dep. (Dkt. Entry 30) at 303-04.)  During previous semesters, Shahin taught classes on Fridays, though no evidence was presented that those classes were scheduled between 12:30 p.m. and 2:00 p.m, the time during which he states that he performs prayers.  (Def.'s S.M.F. (Dkt. Entry 25) ¶ 174.)

On September 25, 1997, Shahin wrote a memorandum to Touhey regarding his course schedule for the spring.  (Shahin's Mem. dated Sept. 25, 1997, Dep. Ex. 119, Attach. 2 (Dkt. Entry 31).)  Shahin requested to teach four courses, including a course on differential equations.  (Id.)  According to Shahin, he had to teach differential equations in order to fulfill a grant award he had received, though Misericordia disagrees that the grant required Shahin to teach the course.[7]  (Compare Pls.' S.M.F. (Dkt. Entry 35) ¶ 172, with Def.'s S.M.F. (Dkt. Entry

_____

[7] The grant was issued by The National Science Foundation to introduce computer science into math and science courses.  (Pls.' S.M.F. (Dkt. Entry 35) ¶ 169.)  Though not completely clear from the record, it does not appear that the grant specifically required Shahin

25) ¶ 172.)  Despite Shahin's request to teach the course, Touhey did not assign Shahin to teach differential equations, though he did assign Shahin to teach two of the other courses he requested.  (Def.'s S.M.F. (Dkt. Entry 25) ¶ 171.)  Touhey defended his decision based on his "opinion that course assignments need to be rotated, in order to keep courses from becoming stale and to keep faculty members intellectually sharp."  (Touhey's Mem. dated Oct. 10, 1997, Dep. Ex. 119, Attach. 4 (Dkt. Entry 31).)

In the September 25, 1997 memorandum to Touhey, Shahin suggested times for scheduling his classes.  (Shahin's Mem. dated Sept. 25, 1997, Dep. Ex. 119, Attach. 2 (Dkt. Entry 31).)  Shahin also said he "need[ed] Friday to be free of classes in order to have my Friday prayer for Moslems, which has to be in Mosque."  (Id.)  Touhey assigned Shahin the class periods he requested, which did not include Friday classes.  (Touhey's Mem. dated Oct. 10, 1997, Dep. Ex. 119, Attach. 4 (Dkt. Entry 31).)  Indeed, Shahin was never again scheduled to teach Friday classes at Misericordia.  (Def.'s S.M.F. (Dkt. Entry 25) ¶ 178.)  Afterwards, he taught a course at another institution on Friday mornings without informing Misericordia.  (Id. ¶¶ 179, 181; See Tr. of Touhey's May 5, 2004 Dep. (Dkt. Entry 30) at 305-07.)

On November 6, 1997, Shahin submitted another grievance against Touhey to the

_____

to teach differential equations.  (Tr. of Shahin's March 9, 2004 Dep. (Dkt. Entry 30) at 285-88.) The grant, though, may have been awarded in part on the Foundation's positive opinion of Shahin, a co-author of the grant.  (Id.)

12

President of the Misericordia.  (Dep. Ex. 120 (Dkt. Entry 31).)  Shahin complained about

Touhey's course assignment practice, his assignment to teach classes during his Friday prayer

in the Fall of 1997, Touhey's failure to assign him to teach differential equations as required by

his grant award, and Touhey's failure to assign him student advisees.  (Id.)  This grievance was

denied.  (Def.'s S.M.F. (Dkt. Entry 25) ¶ 168.)

In November 1998, a group of students approached Touhey about filing a grievance

against Shahin.  (Id. ¶ 184.)  Misericordia's student grievance procedure requires students to

first try to resolve disputes informally through the college's faculty hierarchy before filing a

formal complaint.  (Id. ¶ 186; Dep. Exs. 66-67 (Dkt. Entry 31).)  An aggrieved student was

required to discuss the dispute with the faculty member at issue, then the faculty member's

Department Chair, then the Division Chair, and finally the Vice President of Academic Affairs.

(Dep. Exs. 66-67 (Dkt. Entry 31).)  The parties dispute whether Misericordia's faculty

adequately followed this informal process.  (Compare id. ¶¶ 184-216, with Pls.' S.M.F. (Dkt.

Entry 35) ¶¶ 184-216.)

According to Misericordia, the students approached Touhey asking that Shahin be fired.

(Def.'s S.M.F. (Dkt. Entry 25) ¶ 188.)  Touhey informed the students that he did not have

authority to fire Shahin.  (Id. ¶ 189.)  He later asked the students whether they had met with

Shahin to resolve the dispute as required by the student grievance procedures.  The students

told him that they had met with Shahin and could not resolve their dispute, and rejected

alternative suggestions by Touhey for resolving the dispute.  Touhey then referred the students

to the acting Chair of the Division, Frank DiPino, in accordance with student grievance

procedures.  (Id. ¶ 196.)

Dipino met with the students to discuss the dispute and possible resolutions.  (Id. ¶ 197.)

When told by the students that they only would accept Shahin's termination, DiPino realized he

could not resolve the dispute informally and referred the students to the student grievance

procedures.  (Tr. of DiPino's April 23, 2004 Dep. (Dkt. Entry 30) at 61.)

After failing to resolve the dispute informally, the students filed a formal academic

grievance against Shahin in March 1999.  They alleged inconsistent grading, prejudice against

female students, unpreparedness for class, a hostile classroom attitude, tardiness in returning

homework, and unavailability during office hours.  (Def.'s S.M.F. (Dkt. Entry 25) ¶ 203; Dep. Ex.

140 (Dkt. Entry 31).)  The Academic Grievance Committee found that the students failed to

substantiate their claims, and recommended that the students consider making a formal

apology to Shahin.  (Pls.' S.M.F. (Dkt. Entry 35) ¶ 204.)

Shahin disagrees with Misericordia's account of the grievance.  He claims that members

of Misericordia's faculty orchestrated the students' grievance, and that Touhey specifically

encouraged the students by saying, "this is not the first time I have heard these complaints

[about Shahin]."  .  (Id. ¶¶ 184, 188-89, 198.)  Shahin denies that the students ever personally

met with him to resolve the dispute as required by the student grievance procedures.  (Id. ¶¶

190, 194.)  Furthermore, Shahin claims that Touhey and DiPino never suggested alternative solutions to the dispute.  (Id. ¶¶ 195, 201.)

Shahin filed a grievance against Touhey, DiPino, and Sister Glennon concerning their actions in handling the students' complaint.  (Def.'s S.M.F. (Dkt. Entry 25) ¶ 205.)  The Faculty Grievance Committee determined that the respondents had failed to act reasonably in handling the complaint, but found no concrete evidence that they encouraged the complaint. (Id. ¶¶ 206, 209.)  The committee found that Touhey and DiPino failed to bring Shahin and the students together for mediation, while Dean Glennon did not fully explore informal solutions before initiating the formal grievance process.  (Id. ¶¶ 207-08.)  The committee recommended that Touhey, DiPino, and Glennon write letters of apology to Shahin, and that Misericordia's President write them letters of reprimand.  (Id. ¶ 210.)

Misericordia's President modified the committee's decision in a May 10, 2000 memorandum.  (Id. ¶ 211.)  He asked Touhey to write a letter of apology to Shahin, but Touhey refused to do so.  (Id. ¶¶ 212, 215.)   The President placed a letter of reprimand in Touhey's personnel file as a result.  (Id. ¶ 216.)  DiPino was asked to consider writing a letter to Shahin explaining his actions during the informal grievance process.  (Id. ¶ 212.)  Dean Glennon was asked to explain why she did not require the students to apologize to Shahin after their allegation was denied.  (Id. ¶ 213.)  She answered that this would discourage students in the future from pursuing the grievance process.  (Id. ¶ 214.)  Finally, the President placed a copy of

the Grievance Committee's report in each person's file.

Misericordia's President further recommended that the faculty in the Mathematics and Computer Science Department be split between a Mathematics Department and a newly-created Computer Science and Physics Department.  (Id. ¶¶ 224-26.)   The President indicated that this recommendation was intended to solve the apparent personality conflict between Touhey and Shahin.  (Id. ¶¶ 228, 232.)  Under the realignment, Shahin would be assigned to the Computer Science and Physics Department, but would still teach Mathematics courses and maintain his same office, salary, and status.  (Id. ¶¶ 229-31.)  The plan was implemented for the 2000-2001 academic year.  (Id. ¶ 229.)

Shahin claims that retaliation and discrimination motivated his transfer from the Mathematics Department.  (Pls.' S.M.F. (Dkt. Entry 35) ¶¶ 226, 229.)  Misericordia claims it reassigned Shahin rather than Touhey because Shahin taught both Computer Science and Mathematics courses, while Touhey only taught Mathematics courses.  (Id. ¶ 234.)  Shahin argues that the transfer negatively impacted his career because he was primarily a mathematics scholar and his transfer to the Computer Science and Physics Department limited his ability to progress in mathematics.  (Pls. S.M.F. (Dkt. Entry 35) ¶ 229.)  After his transfer, Shahin was not assigned to teach upper level math courses as was his preference.  (Def.'s S.M.F. (Dkt. Entry 25) ¶ 240; Pls. S.M.F. (Dkt. Entry 35) ¶ 230.)  Dean Glennon asserts that she attempted to modify Shahin's schedule to include an upper-level mathematics course.

(Def.'s S.M.F. (Dkt. Entry 25) ¶ 242.)  Jerry Bradford, who had replaced Touhey as chair of the

Mathematics Department, stated that he made the schedule so Shahin would not have to teach

on Fridays in conflict with his prayer or conduct back-to-back courses.  (Def.'s S.M.F. (Dkt.

Entry 25) ¶ 241.)

Shahin's last complaint is that he was excluded from participating in the hiring process

of a computer science faculty member, Sister Pat Lapczinski.  (Def.'s S.M.F. (Dkt. Entry 25) ¶

218.)  Shahin was present for Sister Lapczinski's open interview and could ask questions of

her.  (Id. ¶¶ 220, 222; Pls.' S.M.F. (Dkt. Entry 35) ¶ 220.)  A departmental meeting was not

conducted to discuss the hiring.  (Pls.' S.M.F. (Dkt. Entry 35) ¶ 219.)  Shahin claims his

exclusion from the hiring process was based on discrimination.  (Id. ¶ 219.)

On August 21, 2000, Shahin accepted a teaching position at Delaware State University.

(Def.'s S.M.F. (Dkt. Entry 25) ¶ 236.)  He informed Misericordia's President of his acceptance

on October 12, 2000.  (Id. ¶ 237.)

B.    Procedural History

On August 12, 1997, Shahin filed a complaint with the Pennsylvania Humans Relations

Commission ("PHRC") and cross-filed a complaint with the Equal Employment Opportunity

Commission ("EEOC").  (Id. ¶ 7; Def.'s Br. in Supp. of Mot. for Summ. J. (Dkt. Entry 29) at 2,

n.1; Exs. A-E, Decl. of Elizabeth C. Leo, Esquire (Dkt. Entry 26).)  Shahin subsequently

amended the complaint three times to include all the complaints detailed above.  (Def.'s S.M.F.

(Dkt. Entry 25) ¶ 8; Exs. A-E, Decl. of Elizabeth C. Leo, Esquire (Dkt. Entry 26).)  The PHRC dismissed all the charges because insufficient evidence was presented to support a finding of probable cause that Misericordia discriminated against Shahin based on his religion or race. (Dep. Ex. 50 (Dkt. Entry 31).)

On May 29, 2002, Shahin filed a complaint in this Court alleging a hostile work environment, disparate treatment, constructive discharge, and retaliation by Misericordia in violation of Title VII.  (Dkt. Entry 1; see also Pls.' Br. in Opp. to Mot. Summ. J. (Dkt. Entry 36) at 15.)  In addition, he claims breach of contract, intentional infliction of emotional distress, and negligent infliction of emotional distress under state law.  His wife alleges loss of consortium. (Dkt. Entry 1.)  Misericordia has moved for summary judgment on all claims.  (Dkt. Entry 24.)

## II.  DISCUSSION

Misericordia seeks judgment in its favor on multiple grounds, including: (1) many of Shahin's discrimination claims are time-barred because he did not raise them with the PHRC in a timely manner; (2) Shahin cannot establish a hostile work environment claim, a disparate treatment claim, or a constructive discharge claim because he has failed to show discriminatory animus; and (3) he fails to establish his retaliation claim because there is no evidence of an adverse action or retaliatory intent by Misericordia in its decision to reassign him to the Computer Science and Physics Department.

### A.    Summary Judgment Standard

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  A fact is "material" if proof of its existence or nonexistence might affect the outcome of the suit under the applicable law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.

All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party, and the entire record must be examined in the light most favorable to nonmoving party.  Cont'l Ins. Co. v. Bodie, 682 F.2d 436, 438 (3d Cir. 1982).  The moving party has the burden of showing the absence of a genuine issue of material fact, but the nonmoving party must present affirmative evidence from which a jury might return a verdict in the nonmoving party's favor.  Anderson, 477 U.S. at 256-57.  Merely conclusory allegations taken from the pleadings are insufficient to withstand a motion for summary judgment.  Schoch v. First Fid. Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990).  Summary judgment is to be entered "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317,

19

322 (1986).

**B.    Timeliness**

Shahin alleges discriminatory acts by Misericordia between 1992 and 2000. Misericordia argues that Shahin cannot present allegations not timely filed under the Pennsylvania Humans Relations Act ("PHRA").  (Def.'s Br. in Supp. of Mot. Summ. J. (Dkt. Entry 29) at 7-12.)  This argument is proper for a claim brought under the PHRA, but is not proper for a Title VII claim like this one.  See 42 U.S.C. § 2000e-5(e).  A Title VII claim is instead dependent on a plaintiff timely filing a claim with the EEOC.

Under 42 U.S.C. § 2000e-5(c), a claim of unlawful discrimination must be filed with the EEOC within 180 days of the unlawful act.  See Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1385 (3d Cir. 1994); Trevino-Barton v. Pittsburgh Nat'l Bank, 919 F.2d 874, 878 (3d Cir. 1990); Berkoski v. Ashland Regional Med. Ctr., 951 F. Supp. 544, 547 (M.D. Pa. 1997). Where, however, a state has established agencies to monitor and correct employment discrimination, the claim must be filed with the EEOC within 300 days of the impermissible employment practice.  42 U.S.C. § 2000e-5(e); Berkoski, 951 F. Supp. at 547; Clark v. Pennsylvania, 885 F. Supp. 694, 706 (E.D. Pa. 1995).  In a state like Pennsylvania, which has a work sharing agreement, for purposes of the filing issue, the EEOC filing is regarded as the PHRC filing, and vice versa.  Colgan v. Fisher Scientific Co., 935 F.2d 1407, 1414-15 (3d Cir. 1991); Berkoski, 951 F. Supp. at 547.  Thus, an employee meets the statutory filing

requirement as long as the claim is filed with the EEOC (or the PHRC) within 300 days of the alleged discriminatory conduct.  See Zdziech v. DaimlerChrysler Corp., 114 Fed. Appx. 469, 471 n.1 (3d Cir. 2004); Brennan v. National Telephone Directory Corp., 881 F. Supp. 986, 993 (E.D. Pa. 1995); see also EEOC v. Commercial Office Products Co., 486 U.S. 107, 124-125 (1988).

In this case, Shahin cross-filed a claim with the EEOC when he filed his complaint with the PHRC on August 12, 1997.  (See Def.'s Br. in Supp. of Mot. for Summ. J. (Dkt. Entry 29) at 2 n.1; Exs. A-E, Decl. of Elizabeth C. Leo, Esquire (Dkt. Entry 26).)  Consequently, Shahin cannot seek redress for discrete discriminatory acts by Misericordia that occurred on or before October 15, 1996 (300 days before August 12, 1997) because they are untimely and non-actionable.  See National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 110-15 (2002) (holding that discrete discriminatory acts occurring prior to the limitations period are not actionable).

Shahin, however, argues that conduct occurring before this date is actionable under a hostile work environment theory of liability under the continuing violation doctrine.  (Pls.' Br. in Opp. to Def.'s Mot. Summ. J. (Dkt. Entry 36) at 4-14.)  The continuing violation doctrine is an equitable exception to the timely filing requirements.  See, e.g., West v. Philadelphia Elec. Co., 45 F.3d 744, 754 (3d Cir. 1995).  In National Railroad Passenger Corp. v. Morgan, the Supreme Court held that, as to hostile work environment claims, an employer may be liable for

discriminatory incidents occurring prior to the applicable 300-day limitations period.  536 U.S. at 115-21.  This is because a hostile work environment claim consists of many incidents that, although not necessarily individually actionable, may, as a whole, constitute a single unlawful employment practice.  Id. at 115-18.

Conduct that occurred outside of the limitations period may be considered only if it is related to an act that occurred within the limitations period involving the same hostile work environment claim.  Id. at 120.  The plaintiff must also establish that the harassment is "more than the occurrence of isolated or sporadic acts of intentional discrimination," but instead constitutes "a persistent, on-going pattern."  West, 45 F.3d at 755.  The Third Circuit Court of Appeals advised courts to consider the following factors in determining whether the plaintiff has met this burden:

> (i) subject matter–whether the violations constitute the same type
> of discrimination;
> (ii) frequency; and
> (iii) permanence–whether the nature of the violations should trigger
> the employee's awareness of the need to assert her rights and
> whether the consequences of the act would continue even in the
> absence of a continuing intent to discriminate.

Id. at 755 n.9 (citations omitted).

As stated above, Shahin first filed a complaint with the EEOC on August 12, 1997.  The issue, therefore, is whether any acts prior to October 15, 1996 may be included as part of Shahin's hostile work environment claim.

22

Consideration of the factors suggested by the Third Circuit leads to the conclusion that the acts alleged by Shahin prior to the limitations period should be considered in his hostile work environment claim.  Most significantly, it does not appear under the permanence prong that any of the alleged acts prior to the limitations period were of the nature that Shahin should have been aware of the need to assert his rights.  None of the acts that Shahin complains of prior to October 15, 1996–such as negative faculty recommendations and denial of a laser printer–constitute egregious behavior.  Indeed, they likely would not be actionable on their own. Moreover, it appears that Shahin did not consider religious or national origin discriminatory animus for the actions until much later.  Thus, it is not clear that Shahin should have known to assert his rights earlier.  As to the other factors, Shahin alleges relatively frequent acts (indicating the type of persistent, on-going discrimination that a hostile work environment claim is designed to remedy) of similar character (national origin and religious discrimination by the faculty of Misericordia designed to instigate Shahin's departure).  A reasonable jury, therefore, could find that the continuing violation doctrine applies to Shahin's hostile work environment claim assertions.[8]

**C.      Hostile Work Environment**

The Third Circuit has established five elements a plaintiff must establish to succeed on a

---

[8]  Of course, the mere fact that Shahin's <u>allegations</u> suffice to forestall a timeliness challenge does not mean that Shahin has presented sufficient <u>evidence</u> of a hostile environment to withstand a summary judgment motion.

hostile work environment claim:

> (1) the plaintiff suffered intentional discrimination because of his or
> her membership in the protected class;
> (2) the discrimination was pervasive [or severe];[9]
> (3) the discrimination detrimentally affected the plaintiff;
> (4) the discrimination would have detrimentally affected a
> reasonable person of the same protected class in that position;
> and,
> (5) the existence of respondeat superior liability.

West, 45 F.3d at 753; see also Weston v. Pennsylvania, 251 F.3d 420, 426 (3d Cir. 2001).  A court should consider all the circumstances in determining whether an environment is hostile or abusive, including "the frequency of the discriminatory conduct; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Harris v. Forklift Systems, Inc., 510 U.S. 17, 23 (1993).

The first element of the test "concretely expresses the principle that Title VII is not 'a general civility code for the American workplace.'"  Jensen v. Potter, 435 F.3d 444, 449 (3d Cir. 2006), implied overruling on other grounds recognized by Moore v. City of Philadelphia, __ F.3d __, 2006 WL 2492256, at *8-9 (3d Cir. 2006) (quoting Oncale v. Sundowner Offshore Services,

---

[9] The Third Circuit had required that discriminatory harassment be "pervasive and regular."  See, e.g., Cardenas v. Massey, 269 F.3d 251, 260 (3d Cir.2001); West, 45 F.3d at 753.  In Pennsylvania State Police v. Suders, the Supreme Court of the United States made it clear that the harassment must be "sufficiently severe or persuasive to alter the conditions of [the complainant's] employment." 542 U.S. 129, 133-34 (2004); see also Jensen v. Potter, 435 F.3d 444, 449 n.3 (3d Cir. 2006).

Inc., 523 U.S. 75, 80-81 (1998)).  Title VII does not "mandate a happy workplace," id. at 451,

rather it redresses a "workplace permeated by discriminatory intimidation" towards a protected

class.  Harris, 510 U.S. at 21.  "Many may suffer severe or pervasive harassment at work, but if

the reason for that harassment is one that is not proscribed by Title VII, it follows that Title VII

provides no relief."  Jensen, 435 F.3d at 449.  But because discrimination may take on

sophisticated and subtle forms, it is improper "to isolate incidents of facially neutral harassment

and conclude, one by one, that each lacks the required discriminatory animus."  Id. at 450

(citing Cardenas v. Massey, 269 F.3d 251, 260 (3d Cir. 2001), and Aman v. Cort Furniture, 85

F.3d 1074, 1081-84 (3d Cir. 1996)).  A court should focus not on individual incidents, but rather,

on the overall situation to determine whether a plaintiff suffered intentional discrimination.  See

id.; Cardenas, 269 F.3d at 261-62.

     In the present case, Shahin admits that he never heard a negative ethnic or religious

remark from anyone employed by Misericordia.  Instead, Shahin argues that the incidents

occurring from 1992 until 2000, in the aggregate, create a genuine issue of fact concerning

whether Misericordia created a religiously or racially hostile work environment.  (Pls.' Br. in

Opp. Mot. Summ. J. (Dkt. Entry 36) at 17-18.)  Though Shahin correctly asserts that incidents

that are facially neutral may be relied upon to establish a hostile work environment, he still must

meet the burden of establishing that he suffered intentional discrimination because of his race

or religion.  See West, 45 F.3d at 753.  He fails to meet this burden.

     Shahin's significant complaints against Misericordia are as follows: Misericordia staff

sometimes gave him negative recommendations, he was denied the department chair despite possessing greater experience than the elected chair, he was denied a new computer and printer, he was not timely notified of being granted sabbatical leave, he was not assigned student advisees, he was not assigned all the classes he desired, Misericordia once assigned him to teach classes during his religious prayer time, he was not allowed to attend some conferences using the department's budget, he was not given the opportunity to teach a summer course, Misericordia's staff improperly handled a student grievance against him, he was reassigned to a different academic department, and he was not consulted in the hiring of a department professor.

None of these complaints suggest an atmosphere hostile to Muslims or Egyptians. Shahin's claim of a hostile environment is also belied by the fact that he became a tenured full professor during the same period he claims that there was a concerted effort to remove him from the faculty.  Many of the claims implicate clearly neutral college policies, such as the college not granting Shahin's request for a new computer outside the college's computer replacement program or Shahin not teaching a summer course for the only summer he showed some interest in teaching one.  Other actions were based on neutral administrative decisions, such as Shahin's department chair deciding to assign classes "in order to keep courses from becoming stale and to keep faculty members intellectually sharp."  (Touhey's Mem. dated Oct. 10, 1997, Dep. Ex. 119, Attach. 4 (Dkt. Entry 31).)  While some requests for funding to attend meetings were denied, others were granted.  Moreover, Misericordia attempted to resolve many

26

of Shahin's complaints: it employed an external evaluator when he complained about his faculty reviews, it offered him alternative computers and printers, it extended the sabbatical grant so he could utilize it the following year, it stopped assigning him classes during his religious prayer period, and it reprimanded the faculty that improperly handled the student grievance against him.  It is also undisputed that the College assisted Shahin in obtaining his visa to work in the United States.

Shahin relies heavily upon the testimony of a former Professor at Misericordia, Dr. Karen Walker.  She claimed that Shahin was subject to a purportedly well-recognized "drill" for eliminating an otherwise tenured Professor: actions intended to isolate a professor by removing important responsibilities and making it uncomfortable for that professor to remain. Significantly, however, Dr. Walker cannot point to any evidence that the "drill" was set in motion because of Shahin's religion or national origin.  Nor is there any evidence of this "drill" being employed to advance a religious or ethnic bias.  Indeed, there is no evidence of any "drill" other than Dr. Walker's testimony, and it seems that only Shahin was exposed to this "drill."[10]  Dr. Walker's testimony is thus her characterization of the matter, but it is not supported by evidence of a discriminatory environment.  There is no direct evidence that any of the unfavorable actions were the product of anti-Muslim or ethnic bias, and there is plenty of evidence of favorable actions.  Thus, this case is unlike Morgan, 536 U.S. at 110-15, in which there was

---

[10] Shahin does not identify any other professor who was forced to resign by being subjected to the "drill."

27

evidence of repeated use by supervisors of racial epithets and other indicia of racial hostility.  In

this case, by way of contrast, there is no overt evidence of discriminatory intent.

Considering the evidence in the aggregate, Shahin has failed to establish that he

suffered intentional discrimination based on his religion or race.  No staff at Misericordia ever

made a negative comment to Shahin about his race or religion.  Indeed, when informed of

Shahin's need to have Friday free for afternoon prayer, Misericordia stopped scheduling him for

Friday classes, to its detriment.  Shahin's jeremiad of unfavorable employment incidents is not

animated by a hint of discriminatory animus.  Shahin, nonetheless, assumes that any action

taken during his employment with which he disagreed must have been based on discriminatory

animus.  More than a self-serving belief that minor adverse employment decisions are

motivated by discrimination is required to survive a summary judgment challenge to a hostile

environment claim.  Otherwise, an employee who believes he has been treated unfairly will be

able to pursue a hostile environment claim without any affirmative evidence that national origin

or religious hostility was severe or pervaded the workplace.  Title VII would then be transformed

into an employment civility code and fair treatment law.  More is required.  In this case, no

rational jury could find that Shahin's workplace was "permeated with discriminatory intimidation,

ridicule and insult."  Harris, 510 U.S. at 21.

The complained of actions did not appear to result in a substantial alteration of Shahin's

work environment, as Shahin steadily progressed from an associate professor to a tenured

professor to a full professor at Misericordia.  There is no evidence that Shahin's ability to

discharge the responsibilities of a college professor was impaired by virtue of a hostile work environment.  Shahin fails to present any evidence that a member of Misericordia acted in a threatening, belittling or demeaning manner towards him.  Indeed, his complaints were often met with patient and polite responses by staff explaining the reasons for their actions.  Though a court must be watchful for veiled discriminatory animus, a plaintiff must produce some evidence indicating that facially neutral actions were motivated by discriminatory animus.  See Wheeler v. Voicestream Wireless Services, No. Civ.A. 3:03-CV-1916, 2005 WL 1240797, at *11 (M.D. Pa. May 24, 2005) ("Plaintiff may establish a hostile work environment claim by presenting evidence of overt discrimination, or by presenting evidence of both facially neutral mistreatment from which discriminatory animus may be inferred and overt discrimination") (emphasis added).  There is simply no evidence to support such an inference here.  Consequently, summary judgment is appropriate on this claim.

### D.    Disparate Treatment

In addition to his hostile work environment claim, Shahin also asserts disparate treatment claims.  Because Shahin does not present any direct evidence of discrimination, the burden-shifting analysis developed in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), governs review of those claims.[11]

---

[11] As discussed above, Shahin is barred from seeking redress for discrete adverse employment acts on or before October 15, 1996 because he failed to timely pursue them with the EEOC.

In order to make out a <u>prima</u> <u>facie</u> case of discriminatory treatment, Shahin must show: (1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination.  <u>See</u> <u>Pivirotto v. Innovative Systems, Inc.</u>, 191 F.3d 344, 352 (3d Cir. 1999) (citing <u>McDonnell Douglas</u>, 411 U.S. at 802).

If the plaintiff establishes a <u>prima</u> <u>facie</u> showing of discrimination, the burden of production shifts to the defendant to set forth a legitimate nondiscriminatory reason for the adverse employment action.  <u>Sarullo v. U.S. Postal Service</u>, 352 F.3d 789, 799 (3d Cir. 2003) (citing <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502, 506-07 (1993)).  The burden of persuasion, however, remains with the plaintiff.  <u>Id.</u> at 799 n.10.  If the defendant meets this burden, the plaintiff must show by a preponderance of the evidence that the defendant's proffered reason was pretextual and that unlawful discrimination was the true reason for the adverse employment action.  <u>Pivirotto</u>, 191 F.3d at 352 n.4.

In the present case, Shahin is a member of a protected class based both on his nationality (Egyptian) and religion (Muslim).  It is also apparent that Shahin was qualified to teach as a mathematics and computer science professor based on his education and experience.

In his brief in opposition to Misericordia's motion for summary judgment, Shahin argues he suffered a tangible or materially adverse employment action because staff at Misericordia orchestrated a deliberate plan of individual slights that in combination would drive him away

from the college ("the drill" as he calls it) and for making him into a "pariah."  (Pls.' Br. in Opp.

Mot. Summ. J. (Dkt. Entry 29) at 35.)  These claims, though, are better suited under a hostile

work environment claim than as a tangible adverse employment claim.  Indeed, most of the

slights that Shahin complains about, such as not receiving a requested printer, do not

individually constitute adverse employment actions.  <u>Burlington Industries, Inc. v. Ellerth</u>, 524

U.S. 742, 761 (1998) ("A tangible employment action constitutes a <u>significant change in

employment status</u>, such as hiring, firing, failing to promote, reassignment with significantly

different responsibilities, or a decision causing a significant change in benefits.") (emphasis

added).  Shahin, though, does present two adverse employment actions worthy of discussion:

(1) his assignment to Friday classes in conflict with his Friday prayers, and (2) his reassignment

to the Computer Science and Physics Department.

     **1.    Assignment to Friday Classes**

The last two elements of a <u>prima</u> <u>facie</u> case of discrimination treatment appear to be met

by Shahin's assignment to Friday classes in conflict with his Friday prayers.  First, it constituted

an adverse employment action because it significantly altered his employment as he had to

decide between his work obligations and his religious obligations.  In addition, a trier-of-fact

could also make an inference of discrimination based on the very fact that he was assigned to

teach in conflict with his religious obligations.

Touhey states that he assigned Shahin to teach Friday afternoon classes because he

was not aware of a potential conflict with Shahin's prayers.  It is undisputed that Shahin

previously taught classes on Friday.[12]  In his deposition, moreover, Shahin admitted that he did

not previously inform Misericordia that he needed Friday afternoons free for prayer.  (Tr. of

Shahin's Mar. 9, 2004 Dep. (Dkt. Entry 30) at 15.)  Thus, it appears that Touhey had a

legitimate nondiscriminatory reason for assigning Shahin to Friday afternoon classes in conflict

with his prayers – he simply did not know of the potential conflict.

Shahin does not present any evidence that Touhey's proffered reason was pretextual,

other than a conclusory statement that Touhey should have had notice of Shahin's restrictions

because they worked in a small department.[13]  A trier-of-fact could not find on this evidence that

Shahin met his burden of persuasion that Touhey's proffered reason was pretextual.  Indeed,

the fact that Touhey never again assigned Shahin to Friday classes, despite the obvious

burden on his class scheduling, shows that Misericordia accommodated Shahin's religious

restrictions.[14]  Additionally, the fact that Shahin taught classes on Friday mornings at another

---

[12] There is no evidence, though, that he previously taught classes in conflict with his Friday afternoon prayers.

[13] Presumably, Shahin's argument is that in such a small department Touhey likely would have heard that Shahin participated in Friday afternoon prayers.  It is plainly obvious from the record, however, that communication between Touhey and Shahin was incredibly limited and mainly took the form of written memoranda, despite Touhey's encouragements that they speak in person.

[14]  Shahin claims that the decision to not assign him any classes on Friday also evidences discriminatory intent, asserting that he remained available to teach at times that did not conflict with prayer services.  Shahin's memo of September 25, 1997 to Touhey however, can only be read as contravening this assertion.  Shahin wrote, "I need Friday to be free of classes in order to have my Friday prayer for Muslims which has to be in Mosque."  (Dep. Ex. 119 (Dkt. Entry 31) (emphasis added).)  He then went on to identify his preferred periods for

college – with extra compensation – casts doubt that Shahin was even subjected to an adverse employment action.

### 2.      Reassignment to Computer Science and Physics Department

At first blush, Shahin's assertion that his transfer from the Mathematics Department to the Computer Science and Physics Department constituted an adverse employment action is questionable given that his position remained principally the same following his transfer: he remained a full tenured professor; his compensation remained the same; he taught nearly the same mix of mathematics and computer science courses; and he remained in his same office. Shahin nonetheless argues that under Jones v. School Dist. of Philadelphia, 198 F.3d 403 (3d Cir. 1999), Misericordia's decision to transfer him into the Computer Science and Physics Department, rather than remain in his preferred choice of the Mathematics Department, constituted an adverse employment action.

In Jones, the plaintiff met his summary judgment burden for establishing an adverse employment action by showing that he was transferred from a high school where he taught some physics courses to a "difficult" high school where he was denied his request to teach physics courses. Id. at 412. Unlike Jones, though, Shahin was not transferred to a more

---

teaching, none of which was on a Friday. (Id.) Thus, the decision to not assign Shahin classes on Friday comported with his express request, and no inference of bias may be drawn from that decision.

"difficult" school, nor denied an opportunity to teach Mathematics courses.[15]

Shahin alleges, however, that being transferred into the Computer Science and Physics Department limited the development of his thirty-three (33) year career in Mathematics, presumably because he would lose opportunities for scholarly work being positioned outside the Mathematics Department.  Shahin has not substantiated this assertion with any evidence.

It is debatable whether Shahin has met his obligation to show that his transfer occurred under circumstances giving rise to an inference of discrimination, though a trier-of-fact could perhaps infer discrimination from the fact that he (an Egyptian Muslim) was transferred rather than Touhey (an American Atheist).  Nevertheless, Shahin fails to rebut Misericordia's legitimate, nondiscriminatory reason for reassigning him to the Computer Science and Physics Department.

Misericordia states that it reassigned Shahin to a new Computer Science and Physics Department in order to defuse the personality conflict between him and Touhey within the Mathematics Department.  Misericordia reassigned Shahin, rather than Touhey, because he taught both Mathematics and Computer Science, while Touhey was only capable of teaching Mathematics.  Other than altering Shahin's assigned department and department chair, Misericordia attempted to keep all other aspects of his position the same, including teaching Mathematics courses.  This is a legitimate nondiscriminatory reason for reassigning Shahin.

---

[15] Shahin, though, was initially denied the opportunity to teach an upper level Mathematics course as he requested.

Shahin fails to present evidence that Misericordia's proffered reason was pretextual and that unlawful discrimination was the true reason for reassigning Shahin.  Instead, Shahin just reiterates his claim that Misericordia could have reassigned Touhey, rather than him.  What remains undisputed is that Shahin could teach computer science courses, while Touhey could not.  Shahin does not suggest some other configuration of departments that would enable both Touhey and Shahin to remain as Professors, and the evidence does not support a conclusion that Touhey should have been fired because of his interaction with Shahin.  Shahin's argument does not raise a significant level of doubt that Misericordia's simpler plan to reassign Shahin actually was pretext for discrimination.  Indeed, short of firing Touhey, Misericordia appears to have done all it could to accommodate Shahin.  Consequently, summary judgment is appropriate for this claim.

### E.   Constructive Discharge

Shahin's also alleges that working conditions at Misericordia became so intolerable that he was forced to leave the college.  (Pls. Br. in Opp. Mot. Summ. J. (Dkt. Entry 36) at 36-37.) An employer may be liable for constructive discharge under Title VII.  Pennsylvania State Police v. Suders, 542 U.S. 129, 143 (2004).  In Suders, the Supreme Court stated that a hostile-environment constructive discharge claim "entails something more" than a hostile work environment claim, as it also requires the claimant to show "working conditions so intolerable

that a reasonable person would have felt compelled to resign."[16]  Id. at 151.  Because Shahin

failed to substantiate an actionable hostile work environment claim, it necessarily follows that

Shahin also fails to meet the more stringent requirements of a hostile-environment constructive

discharge claim.

F.    Retaliation

Shahin's last Title VII-based claim is that Misericordia retaliated against him by

transferring him from the Mathematics Department to the newly created Computer Science and

Physics Department.  (Pls. Br. in Opp. Mot. Summ. J. (Dkt. Entry 36) at 37-39.)  A retaliation

claim under Title VII is analyzed under a similar McDonnell Douglas-type burden shifting

framework as utilized for a disparate treatment claim.  Under this approach, a plaintiff presents

a prima facie case of retaliation by showing: (1) the employee engaged in a protected employee

activity; (2) the employer subjected the employee to an adverse employment action after or

contemporaneous with the employee's protected activity;[17] and (3) a causal link exists between

the employee's protected activity and the employer's adverse action.  Moore v. City of

Philadelphia, __ F.3d __, 2006 WL 2492256, at *7 (3d Cir. 2006).

---

[16] A constructive discharge claim under Title VII differs from a hostile work environment
claim because it may preclude a defendant from presenting an Ellerth/Faragher-based
affirmative defense to liability.  See Suders, 542 U.S. at 151-52.

[17] As indicated in Moore, this second element is satisfied if the alleged retaliatory action
is one that "'well might have dissuaded a reasonable worker from making or supporting a
charge of discrimination.'" 2006 WL 2492256, at *8 (quoting Burlington N. & Sante Fe Ry. Co.
v. White, ___ U.S. ___, 126 S.Ct. 2405 (2006).  The transfer of departments in this case
satisfies the second element of the prima facie case.

If the plaintiff establishes a <u>prima</u> <u>facie</u> case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. <u>See</u> <u>Delli Santi v. CNA Ins. Companies</u>, 88 F.3d 192, 199 (3d Cir. 1996); <u>Martinelli v. Penn Millers Ins. Co.</u>, No. 3:CV 02 2292, 2005 WL 2100695, at *7 (M.D. Pa. Aug. 29 2005). If the defendant satisfies this requirement, the burden of production returns to the plaintiff, who must show by a preponderance of the evidence that the reasons proffered by the defendant were only a pretext for retaliation. <u>See</u> <u>Delli Santi</u>, 88 F.3d at 199; <u>Martinelli</u>, 2005 WL 2100695, at *7.

Shahin's retaliation claim is essentially the same as his disparate treatment claim, except he varies the alleged unlawful reason for Misericordia's decision to transfer him to the Computer Science and Physics Department. In his retaliation claim, he alleges that he was transferred because he complained of discrimination; while in his disparate treatment claim, he alleges that he was transferred because of national origin and religious discrimination.

However, even assuming that Shahin adequately presents a <u>prima</u> <u>facie</u> case for retaliation, he again fails to rebut Misericordia's proffered nondiscriminatory, legitimate reason for reassigning him. Specifically, Misericordia states that it reassigned Shahin in order to defuse the evident personality conflict between him and Touhey, and Touhey was not reassigned because he could only teach Mathematics. Misericordia made an affirmative effort to keep all other aspects of Shahin's employment the same after his transfer. Because Shahin fails to rebut Misericordia's proffered nondiscriminatory, legitimate reason for reassigning him,

summary judgment is appropriate for this claim.

    G.    **State law actions**

    As dismissal of Shahin's federal law claims is warranted, this Court may decline to

exercise supplemental jurisdiction over his state-law claims of breach of contract, intentional

infliction of emotional distress, and negligent infliction of emotional distress. See 28 U.S.C.

1367(c)(3); Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 444 (3d Cir. 1997);

Stehney v. Perry, 101 F.3d 925, 939 (3d Cir. 1996).  Accordingly, this Court will decline to

exercise supplemental jurisdiction over Shahin's state-law claims and also those of his wife.

These claims, therefore, will be dismissed without prejudice.

## III.  CONCLUSION

    Shahin claims both national origin and religious discrimination by faculty of Misericordia.

He fails to present any conspicuous instances of discrimination by Misericordia's staff, but

instead asks this Court to infer discriminatory intent from an extensive list of employment

setbacks, while completely disregarding evidence that shows an absence of discriminatory

treatment, such as proceeding to the status of a tenured, full professor.  Elevating the litany of

grievances presented here to the level of a religious and ethnic hostile environment would

effectively make any disgruntled worker a Title VII claimant.  The appropriate remedy for these

employment squabbles was the one Shahin repeatedly pursued while at Misericordia – the

grievance process created by the college.  Some of his claims were rejected as not grievable;

one claim was sustained.  The handling of the grievances does not suggest an academic

atmosphere rife with anti-Muslim or Egyptian hostility.  On the contrary, the fact that Shahin

rose to the rank of a tenured full professor implies the absence of religious or ethnic bias.

Because Shahin does not substantiate an actionable Title VII claim, Defendants' motion for

summary judgment (Dkt. Entry 24) will be granted.  An appropriate Order follows.


**s/ Thomas I. Vanaskie**
Thomas I. Vanaskie
United States District Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MAZEN SHAHIN, and** | : | |
| **NINA SHAHIN, his wife** | : | |
| **Plaintiffs** | : | |
| **v.** | : | **3:CV-02-0925** |
| | : | **(CHIEF JUDGE VANASKIE)** |
| **COLLEGE MISERICORDIA, a** | : | |
| **Pennsylvania Non-Profit Corporation** | : | |
| **Defendant** | : | |

## ORDER

**NOW, THIS 13th DAY OF SEPTEMBER, 2006,** for the reasons set forth in the foregoing Memorandum, **IT IS HEREBY ORDERED THAT:**

1. Defendant's Motion for Summary Judgment (Dkt. Entry 24) is **GRANTED**.

2. Plaintiffs' state-law claims for breach of contract, intentional infliction of emotional distress, and negligent infliction of emotional distress, and loss of consortium are **DISMISSED WITHOUT PREJUDICE** for lack of subject matter jurisdiction.

3. The Clerk of Court is directed to enter judgment in favor of Defendant on all Title VII claims and to mark this matter **CLOSED**.

s/ Thomas I. Vanaskie
Thomas I. Vanaskie
United States District Judge